IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSEPH BARBOA, aka
JOSEPH SANDOVAL,

          Plaintiff,

    vs.                               No. CIV 01-210 WJ/LFG

SCOTT BAIRD, VAN ELDREDGE,
A.N. ESCALANTE, and
BERNALILLO COUNTY,

          Defendants.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

This is a *pro se, in forma pauperis* civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiff Joseph Barboa, aka Joseph Sandoval ("Barboa"), was shot between the eyes by sheriff's deputies effecting his arrest during an incident that took place on March 17, 1998. Barboa filed this action against Bernalillo County Sheriff's deputies Scott Baird ("Baird"), Van Eldredge ("Eldredge"), and A.N. Escalante ("Escalante"), alleging that they used excessive force, and attempted to murder him, in effecting his arrest. He seeks $10 million, future medical payments and punitive damages. He also seeks to hold Bernalillo County liable for creating customs and policies that encourage the use of excessive force against arrestees.

---

[1] Within ten (10) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

## Procedural Background

Defendants filed a motion for summary judgment [Doc. 11] on June 21, 2001. Barboa filed a response [Doc. 16], and defendants replied [Doc. 18]. Thereafter, Barboa filed three more responsive pleadings, denominated Surreply [Doc. 20], Amended Response [Doc. 25], and Memorandum with Exhibits [Doc. 26].

On April 29, 2002, the court entered an order [Doc. 32] adopting the magistrate judge's recommendation [Doc. 31] to deny the motion for summary judgment for the time being, and to order a Martinez Report for clarification of the factual background surrounding Barboa's claims of excessive force and the status of any remaining challenges to his conviction. The Martinez Report [Doc. 38] was filed on May 31, 2002.

On June 11, 2002, Barboa filed a response [Doc. 40] to the Martinez Report, along with a motion [Doc. 41] to strike portions of the Baird affidavit, which was attached to the Report. The motion to strike prompted a response by Defendants [Doc. 48], and a reply by Barboa [Doc. 49], and that motion is now fully briefed. In addition, Barboa filed two more responses to the Martinez Report, denominated Supplemental Response [Doc. 42] and Affidavit [Doc. 43].

On August 9, 2002, Defendants filed a Supplement to the Martinez Report [Doc. 47], advising the Court of late developments with regard to Barboa's challenges to his conviction. This supplement spawned four responses by Barboa, denominated Response (Surreply) to the Supplement [Doc. 50], Reply to the Supplement [Doc. 51], Second Supplemental Response [Doc. 52], and Third Supplemental Response [Doc. 54].

Meanwhile, on November 7, 2002, Defendants filed a motion to strike and preclude further filings of impertinent, immaterial, and non-permitted pleadings [Doc. 53], to which Barboa filed a

response [Doc. 55].  Defendants replied [Doc. 56], and Barboa filed a surreply [Doc. 57].

In addition, on December 9, 2002, Barboa filed a motion for appointment of counsel [Doc. 59] and a petition for writ of habeas corpus ad testificandum [Doc. 58].

In connection with their Martinez Report, Defendants again ask for summary judgment, arguing:  (1) this action is precluded on the principle of <u>Heck v. Humphrey</u>, in that it calls into question the validity of Barboa's conviction, which conviction has not been overturned or invalidated; and (2) even if <u>Heck</u> is inapplicable, Defendants are entitled to summary judgment on the merits, or based on qualified immunity.  For the reasons given below, the Court recommends that summary judgment be entered in favor of Defendants, that the two outstanding motions to strike various filings be denied, that the latest motion for appointment of counsel be denied, and that the petition for writ of habeas corpus ad testificandum be denied as moot.

## **Factual Background**

Barboa alleges in his complaint that, on March 17, 1998, at about 6 a.m., he was fleeing from the defendants, Sheriff's deputies Baird, Eldredge, and Escalante, when "they shot him between the eyes in an attempt to kill" him, and rendered him blind in one eye.  [Complaint, at 2B,  ¶1].

Barboa says that these defendants were responding to a nonviolent property crime, that is, an apparent burglary at Jerry's Market on Isleta Boulevard in Bernalillo County, when Escalante chased Barboa with a vehicle and attempted to run him down,[2] and Baird and Eldredge chased him on foot, yelling that if he did not stop he would be shot and killed.  [<u>Id.</u>, at ¶¶2-4].  He further alleges that, "[t]o emphasize this point, Defendant Eldredge shot and killed a dog with Defendant Eldredge's hand gun.  Numerous shots were fired.  Defendant Baird also had his hand gun out and was waiving

---

[2]Barboa later retracted the allegation that Escalante attempted to run him down.  *See*, Doc. 43, at 14, ¶ 37].

[sic] it at the Plaintiff."  [Id., at ¶4].

Barboa goes on to state in the complaint that "in an act of preservation and self-defense," he jumped into a vehicle in an attempt to commandeer it and escape defendants.  He states that Eldredge broke out a window in the vehicle with a weapon, and Baird "took up an offensive shooting stance in front of the vehicle.  Barboa says he was backing away in the vehicle when Baird shot him between the eyes in an attempt to murder him, in fulfillment of his earlier threats.  [Id., at 2B-2C, ¶¶5,6].  He also alleges that the three deputies handcuffed him, threw him in the mud, and refused to render first aid.  [Id., at 2C, ¶8].  He acknowledges, however, in his petition for state habeas corpus filed November 7, 2001, that he "can not remember clearly at all what took place on March 17, 1998." [Doc. 38, Ex. V, at RP0215].

It is undisputed that Barboa lost his left eye following this incident.  [Id., at 2C, ¶9; Answer, at 3, ¶15].  He was transferred to UNM Hospital following the shooting, and he says that in addition to losing sight in one eye, he also sustained broken bones in his face, a broken jaw, and brain damage, and that he currently suffers from migraine headaches, post-traumatic stress disorder, paranoia disorder, depression, memory loss, and lack of concentration.  [Doc. 38, Ex. V].  Barboa claims that excessive force was used by the three individual defendants, and that the municipal defendant, Bernalillo County (substituted for the original defendant, Bernalillo County Sheriff's Department, *see* Order, Doc. 5), maintained a policy of encouraging the excessive use of force by Sheriff's deputies and failed to supervise the deputies and prevent their use of excessive force.  [Complaint, at 2C, 3].

Defendants paint a different picture of the early morning events of March 17, 1998. Defendant Baird filed his affidavit [Doc. 13, Ex. A] in connection with defendants' original motion for summary

4

judgment.[3]  In the affidavit, Baird states that he was on duty that morning when, shortly before 6 a.m., Sheriff's dispatch received a call that an alarm had gone off at Jerry's Market on Isleta Blvd. SW.  Defendants Escalante and Eldredge were initially dispatched to respond.  Baird says he was advised by dispatch that a possible suspect was in the vicinity of the market, driving a white pickup truck.  He then heard on the radio that Eldredge was in pursuit of the suspect vehicle with his lights flashing, as the vehicle would not stop.

Baird's affidavit continues:  He and Eldredge followed the suspect's vehicle, which had turned onto a ditch bank road, until the vehicle lost control and slid into the ditch.  He and Eldredge, who were both dressed in police uniforms, parked their police cars and saw the suspect leaving his vehicle. When Eldredge drew his weapon and ordered the suspect, later identified as Barboa, to stop, Barboa took off running.  Baird and Eldredge chased Barboa through fields and over fences until they arrived at a residential area, where Barboa jumped into the passenger's seat of a red pickup truck.  An innocent bystander was in the driver's seat at the time; he later stated that Barboa just jumped into the truck and ordered him to drive away.

The Baird affidavit continues:  Eldredge approached the red truck from the passenger side, while Baird approached from the driver's side.  Baird ordered the original driver to get out of the vehicle, and when the driver complied, Barboa slid over from the passenger's side to the driver's side. When Eldredge broke the passenger side window with his flashlight and leaned inside the truck, Barboa backed up suddenly.  Eldredge, whose arm was still in the truck, was dragged and eventually thrown from the vehicle, suffering a head laceration and a broken rib.  Barboa stopped the truck after Eldredge was thrown off.  At that point, Baird was standing directly in front of the truck.  He states

---

[3]Later in this ruling, the Court denies Barboa's motion to strike portions of the Baird affidavit.

in the affidavit that he and Barboa were looking directly at each other.  With his service pistol drawn, he ordered Barboa to stop and get out of the truck.  Instead of doing so, he says, Barboa put the truck into drive and started forward suddenly.  Fearing for his life, Baird fired his pistol through the windshield and saw Barboa slump in his seat.  The truck then rolled to a stop.

In response to the Court's order for a Martinez Report, Defendants submitted as exhibits the recorded statements of Baird and Eldredge, taken in connection with the Sheriff's Department investigation into the shooting incident.  [Doc. 38, Exs. D & I].  The interview with Baird was conducted by Detective Andrew D. Ortiz on March 19, 1998, two days after the events described above; the interview with Eldredge was taken on March 24.  The statements given by Baird and Eldredge essentially confirm the narrative given in the Baird affidavit, but they include more detail. The statements include the following additional information:

Both Baird and Eldredge stated that they were in full uniform at the time of the incident, wearing their badges and driving fully marked police cars with working lights and sirens.  Eldredge and Escalante arrived at Jerry's Market in response to the dispatch call regarding the alarm going off. Dispatch told the officers that a white pickup truck had been seen leaving the area of the market, and Escalante said that she had seen such a vehicle at the corner of Malpais and Potomac Roads.  Baird was then called to assist in locating the suspect vehicle.  Shortly thereafter, Eldredge saw a white pickup driving erratically, running a stop sign and heading across two lanes of traffic without regard for oncoming traffic.  Several vehicles had to brake suddenly to avoid colliding with the white pickup. Eldredge initiated full emergency equipment on his vehicle – lights and siren – and began to pursue the truck.

Eldredge said further that the truck pulled into a small parking lot and stopped.  Eldredge

pulled up behind the truck.  It was still early morning, but at this point the sky was light enough  that

no driving lights were necessary.  According to Eldredge, the driver of the white pickup opened the

door, stuck his head and part of his torso out of the vehicle, and looked directly at Eldredge, who

identified himself as a Sheriff's deputy and ordered the driver to stay in the truck.  At this point,

Eldredge says, he considered the scene to be a high risk or felony stop, so the driver gave verbal

commands to remain in the truck and was waiting for backup to arrive before he ordered the driver

to get out.  The driver didn't say anything.  He shut the door of the truck and started to pull away.

He spun the vehicle in circles in the parking lot mud, almost striking the police car, and crashed into

a utility pole at a high rate of speed, lifting the back end of the truck off the ground.  The driver then

backed up, left the parking lot, and drove onto Isleta Boulevard, turning off almost immediately onto

a ditch road.

Barboa does not acknowledge driving erratically that morning.  He says that he saw a police

car tailing him and, not sure whether he was being pulled over, he says he slowed down and drove

into the parking lot.  [Doc. 42, at 6; Doc. 43, at 4, ¶ 11].  Barboa says that he was on his way to a

methadone clinic and, aware that he had a misdemeanor warrant out for his arrest, was worried that

the policeman would arrest him and take him to jail and he would miss his methadone dose.  He states

that he "decided he would not go to jail and suffer without his methadone 'cold turkey,'" so he drove

away instead of obeying the officer's commands to stay inside the vehicle.  [Doc. 42, at 6-9; Doc. 43,

at 6, ¶ 18].  He does not dispute that he failed to heed the officer's commands, nor does he dispute

that he was attempting to get away from the officer.

Baird stated that he was in radio contact during these events, and as Eldredge pursued the

white truck north on Isleta Boulevard in his patrol car with full emergency equipment going, Baird

caught up to him and joined in the chase at about the point when the white truck turned onto the ditch road. The pickup was fishtailing in the muddy road of the ditch bank, and it was apparent that the driver was having difficulty maintaining control. The truck eventually slid into the ditch, turning over on its side. Both officers got out of their vehicles. The driver of the white pickup, later identified as Barboa, climbed out, stood on the side of the truck, and looked directly at the officers.

Eldredge drew his gun, yelled "Sheriff's Department," and ordered Barboa to show his hands. He also ordered Barboa several times to stop. Barboa did not obey, but instead jumped down from the truck and ran away on foot. Eldredge and Baird holstered their weapons and pursued Barboa across fields and over fences. Eldredge, who was running a bit ahead of Baird, communicated by walkie talkie with Escalante, telling her to head over toward Sanchez Road and try to cut the suspect off. By this time, it was full daylight.

Eldredge says he saw Barboa run into a residential area and jump into the passenger side of a small red pickup truck. Around this time, Baird caught up to Eldredge, and Eldredge informed him that Barboa was in the truck. As the officers approached the red truck, a dog, which appeared to be a reddish-colored Chow, came towards Eldredge. Eldredge says that the dog was barking, growling, showing its teeth and taking an aggressive stance toward him, with the fur standing up on the back of its neck. It appeared to be a guard dog and was not deterred by his presence; rather, the dog ran toward him and eventually stopped and "took position," not intending to give any ground. Eldredge says he was afraid the dog would attack him or Baird, who was running behind him at this point, and would thereby prevent them from apprehending the suspect. He therefore fired one shot from his handgun and killed the dog.

Baird and Eldredge continued on to where the red pickup was idling with two people inside.

8

Eldredge took position near a tree on the passenger side of the truck, and Baird approached from the

driver's side.  Eldredge shouted, "Sheriff's Department," and both Baird and Eldredge ordered the

men inside the truck to get out.  The driver, later identified as Phillip Padilla, got out right away and

moved away from the truck toward Baird.  He complied with Baird's commands to put his hands on

his head and turn around.  Baird could see that Padilla was not armed, and Baird concluded that he

was probably an innocent bystander.

Eldredge continued to command Barboa, who was still in the truck, to come out.  Baird says

there is no question that anyone inside the truck could hear the commands.  Eldredge ordered Barboa

two or three more times to come out and when Barboa did not comply, Eldredge decided he would

have to remove him physically from the truck.  By this time Barboa had moved over to the driver's

seat, and Eldredge was standing outside the truck, on the passenger side.  Eldredge could not get the

door open, so he holstered his pistol and used his flashlight to break out the passenger side window.

The flashlight was in his right hand.

In one of his responses to the summary judgment motion, Barboa disputes that Eldredge

broke the window at all.  [Doc. 26, at ¶ 7].  However, this contradicts his own statement in his

complaint, that "Defendant Eldredge broke one of the windows of the Plaintiff's [*i.e.*, Padilla's]

vehicle with a weapon."  [Doc. 1, at 2B, ¶ 5].  Barboa later says, in one of his responses to the

Martinez Report, that the complaint was drafted by another inmate and some of the facts in the

complaint are incorrect.  In particular, he notes, "Contrary to the statement in the complaint that

Deputy Eldredge broke the window is unknown for I did not hear the window ever break and neither

did Deputy Baird."  [Doc. 43, at 14, ¶¶ 37-38].

Eldredge says that, as soon as he broke the window, the truck immediately went into motion.

Eldredge was never able to reach Barboa across the seat.  The force of his swing brought his right arm into the truck up to his shoulder, and as the truck backed up, Eldredge says he was carried with it.  His feet were swept up, and he was dragged along as the truck backed up in a circular path.  The truck was accelerating, and he was unable to free himself.  Eldredge says there is no question that it would have been clear to the driver that he was being dragged.  The truck eventually came to a forceful stop, and Eldredge was flung off.  Baird says that he saw the truck backing up, that it came very close to hitting him, and that it looked as if it ran right over Eldredge.  He says that he saw Eldredge flung upside down in the air and thought the truck had hit him.  In fact, he says, he thought Eldredge was probably dead.

Barboa asserts that Eldredge was not dragged at all, but rather was running along beside the vehicle, trying to grab hold of it.  [Doc. 26, at ¶ 7; Doc. 43, at 10, ¶ 27; Doc. 49, at 2].  However, as discussed below, several police witnesses describe physical evidence of parallel drag marks beside the acceleration marks left by the vehicle's tires.  Eldredge says he slid along on the ground after being thrown from the truck and landing on the left side of his body.  He eventually struck his head on a rock and came to a stop.  Eldredge later learned that he had a cracked rib and bruises and scrapes on his left eye, arm, and leg.

Eldredge says that when he was thrown from the vehicle, he did not lose consciousness or become disoriented, although his vision did become blurry for a couple of seconds.  He saw the truck start forward again, and he saw Baird in front of the truck.  The truck started going forward and was moving toward Baird, when Baird fired one shot which struck Barboa, and the truck stopped moving.

Eldredge says that the truck could have gone to the right or the left of Baird, or perhaps even backward, but instead it drove toward him and would have struck and injured him if it continued in

that path.  Baird says also that it would have been obvious to the driver that Baird was in the path of the vehicle.  He said that he and Barboa were face to face, looking at each other, and Baird continued to shout commands at Barboa to stop and get out of the truck.  Baird says he has no doubt that Barboa could hear him.  He says he felt that his life was threatened, since he believed the driver had just backed over or struck and probably killed Eldredge, and he was now going to drive forward and run him down, too.  He says that the distance was too short for him to get out of the path.  After the shooting, the truck rolled to a stop and Barboa was pulled from the truck and placed under arrest.  Baird's shot had struck Barboa between the eyes, and he later lost sight in his left eye.

In an account of the incident set forth in an affidavit in support of a warrant to search the red pickup truck [Doc. 38, Ex. B], Detective Andrew Ortiz recounted the incidents of March 17, 1998, as told to him by the officers on the scene.  He also described in his affidavit the physical evidence confirming the officers' account, including evidence of stolen items taken from Jerry's Market and recovered from Barboa's white pickup truck, acceleration marks in the driveway of the home where the red pickup truck had been parked, marks in the mud running parallel to the acceleration marks consistent with feet dragging beside the pickup, and evidence of the shot fired into the windshield.

In Sheriff's Department investigative reports following the shooting, L.L. Flores and Michael King reported finding physical evidence confirming the account of the officers, as given above.  [Doc. 38, Exs. E, F].  Flores observed the scene on the morning of March 17, 1998 and encountered a white pickup truck lying on its side in the dry ditch, with cigarettes and hand carriers from Jerry's Market in the bed of the pickup.  King found a piece of red tail light in the parking lot of Jerry's Market that matched a missing piece of the taillight on the white pickup lying in the ditch.  At the shooting scene, Flores noted footprints, acceleration marks and drag marks consistent with Eldredge's account of

being dragged by the red pickup as Barboa backed up.

Defendant Escalante and Officer R. Matthews filed police reports on the date of the incident, and their accounts substantially coincide with Baird's and Eldredge's. [Doc. 38, Exs. G, H]. Matthews says in his report that he arrived at the scene in time to observe the red pickup back up, accelerate, and vault over a small irrigation ditch. He says he pulled his car up to the driver's side of the truck in an attempt to pin it and keep the driver from completing a turn that would allow him to escape onto El Ranchito.

Matthews says that he saw the driver accelerate forward directly toward Baird. He saw Baird point his pistol at the truck and fire one round into the cab. The truck rolled to a stop, and Matthews and Escalante pulled Barboa from the truck and laid him onto the ground. Barboa had a large amount of blood on his hands, arms, and face. He did not say that he saw Eldredge being dragged or struck by the red truck, but he noticed at this point that Eldredge was muddy and had blood on his face. Matthews called for rescue and read Miranda warnings to Baird and Eldredge. [Doc. 38, Ex. G].

Escalante states in her report that she and Eldredge were dispatched to Jerry's Market at approximately 6:00 a.m. on March 17, 1998. While waiting in the parking lot at the market for a canine unit, she saw a white pickup truck driving erratically on Isleta Boulevard. She called Baird on the radio and told him about the truck, while she and Eldredge continued to secure the scene. A few minutes later, she saw the white truck again, driving at a high rate of speed and fishtailing in traffic. Eldredge attempted to stop the vehicle, and when it failed to stop, he began to pursue it. Escalante remained at Jerry's Market to wait for the canine unit. [Doc. 38, Ex. H].

Escalante reported that she continued to listen to dispatch reports from Eldredge, who stated that the white truck had wrecked at one point, but was continuing on. She later heard Eldredge

advise dispatch that the white truck rolled into a ditch, and that he and Baird were in foot pursuit of the driver along the ditch bank. Escalante drove to Sanchez Road to assist in apprehending the fleeing suspect. She continued to listen to Eldredge's dispatch reports, which stated that the suspect was getting into a red pickup truck. At this point, she and Matthews drove up to the scene. She saw a red truck backing out of a driveway, toward Matthews' police car, at a high rate of speed. She saw the truck stop, then turn toward Baird and begin to accelerate forward. She then saw Baird fire one shot into the windshield and the driver fall over inside the truck. [Id.].

She reported that she and Matthews removed the driver from the truck, and she recognized him as Joseph Barboa. Barboa was injured, but he was conscious and identified himself to Escalante. Escalante stated that she placed a blanket on Barboa and told him to keep talking until rescue arrived. She removed handcuffs from Barboa so that rescue could put him on a backboard. She says that Barboa was then transferred to UNM Hospital by helicopter. Like Matthews, Escalante did not say that she saw Eldredge being dragged or struck by the red pickup, but she did state that she saw Eldredge after the incident with a bloody and swollen left eye, and with mud on the left side of his uniform. [Id.].

The original driver of the red truck, whose name is Phillip Padilla, was interviewed by the police investigator on the morning of March 17, 1998. He told the interviewing officer that he was on his way to work that morning but had stopped off at a friend's house. Padilla left his truck in the friend's driveway and knocked on the door of the house. Getting no answer, he got back into the truck and was immediately accosted by a man whom he had never seen before, who jumped into the passenger side of the truck and told Padilla to drive away. The man looked scared, Padilla said, and it was clear that he was running from somebody. [Doc. 38, Ex. J].

Padilla says he was scared, too.  Shortly after the man jumped into his vehicle, a police officer ordered Padilla at gunpoint to get out of the truck.  Padilla immediately got out and lay on the ground as the truck began to take off.  He says the truck backed out, going very fast in reverse, so fast that the tires burned.  Padilla got up off the ground and went around to the side of the house, as he was afraid of getting shot.  He didn't look back, didn't see any other officers at that point, and didn't hear anyone yelling out commands to the driver of the truck.  He says he was afraid; indeed, he was "all shook up" to the extent that "I had an accident in my pants."  Padilla heard one shot being fired and saw the truck parked in the weeds, with two police officers walking toward it.  [Id.].

## Discussion

A.  Introduction

Barboa asserts that the individual defendants used excessive force, and even attempted to murder him, in effecting his arrest on March 17, 1998.  The Fourth Amendment secures to all persons the right to be free from unreasonable searches and seizures.  Claims of excessive force in making a seizure are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989).

> Whenever an officer restrains the freedom of a person to walk away, he has seized that person ... and apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment ....  A police officer may arrest a person if he has probable cause to believe that person committed a crime ... [but] notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him.

Tennessee v. Garner, 471 U.S. 1, 7-9, 105 S. Ct. 1694, 1699-1700 (1984).

Defendants do not dispute that, in shooting Barboa between the eyes, Baird applied

14

potentially deadly force in apprehending him.[4]  (*See*, Doc. 38, at 17:  "since *deadly force is justified as a response to a deadly assault*, the shooting [of Barboa by Baird] cannot be deemed excessive." [Italics added]).  The use of deadly force by a police officer is "objectively reasonable" under certain conditions:

> A police officer may not seize an unarmed, nondangerous suspect by shooting him dead ....  The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.  It is not better that all felony suspects die than that they escape ...  [H]owever ... [w]here the officer has probable cause to believe that  the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Tennessee v. Garner, 471 U.S. at 11-12.

    In the Garner case, the defendant police officer, who shot and killed a 15-year-old unarmed fleeing burglary suspect, "never attempted to justify his actions on any basis other than the need to prevent an escape," Id., at 21.  The Supreme Court concluded that, under these circumstances, the use of deadly force was constitutionally unreasonable.  In the present case, defendants' contention is, not simply that they were attempting to prevent Barboa from escaping, but that Baird was justified in applying deadly force because Barboa threatened Baird with a "weapon" in that he aimed the truck directly at Baird and began to drive toward him; because Baird witnessed Barboa inflict serious physical harm on Eldredge to the extent that Baird thought Barboa had killed Eldredge; and because

---

[4]In holding that a police shooting which rendered a suspect quadriplegic constituted "the use of deadly force" in the constitutional sense, the Tenth Circuit stated, "We note that the use of deadly force does not occur only when the suspect actually dies." Ryder v. City of Topeka, 814 F.2d 1412, 1417 n. 11 (10th Cir. 1987).

the officers had reason to think that Barboa would pose a continuing threat of serious harm to himself and others if allowed to escape.

If Barboa threatened Baird with a weapon, inflicted serious physical harm on Eldredge, or posed a continuing threat of serious physical harm to others, then Baird's actions in using potentially deadly force were justified as a matter of law. The question is whether defendants have met their burden on summary judgment of showing there is no genuine issue as to these facts.

B. Standards for Summary Judgment

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment. Fed. R. Civ. P. 56(e); Bacchus Indus., Inc. v. Alvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

16

"The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to create a dispute of fact that is 'genuine.'"  Lancaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).  Summary judgment is appropriate only if there not sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party.  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.  Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id., at 251-52, 106 S. Ct. at 2512.  The Court in considering a motion for summary judgment construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion.  Foster v. AlliedSignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

C.  Applicability of Heck v. Humphrey

Before examining the merits of Defendants' summary judgment motion, it is necessary to address the matter of application of Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994), to the facts of this case.

The Supreme Court held in Heck v. Humphrey that, if a prisoner's claim under Section 1983 necessarily implies the invalidity of his conviction, the claim is not cognizable unless the plaintiff can prove that the conviction or sentence has been reversed, expunged, or otherwise invalidated. Defendants herein argue that Barboa's claim for excessive force necessarily implies the invalidity of his conviction for aggravated battery upon a police officer (great bodily harm), for the injury to Eldredge,[5] and aggravated assault upon a peace officer (deadly weapon), for the attempt to run down

---

[5]The Judgment and Sentence entered in State v. Sandoval aka Barboa, No. CR 98-1077, reads "aggravated assault upon a peace officer (great bodily harm), a 3rd degree felony offense occurring on or about March 17, 1998, as charged in count 1 of the Indictment."  The Court assumes that the word "assault" is a typographical

Baird with a vehicle.  (Barboa was also convicted of commercial burglary, larceny over $250, and unlawful taking of a vehicle).

The parties disagree as to whether the claim for excessive force "necessarily implies the invalidity" of Barboa's conviction on the aggravated battery and aggravated assault charges.  There is also a factual dispute as to the current status of Barboa's conviction.  The Court is inclined to agree with Defendants that Barboa's excessive force claim does indeed imply the invalidity of his conviction on those two charges.  However, the case law is not absolutely clear on this point; *see,* footnote 3 in the Court's Recommended Disposition of Defendants' Motion for Summary Judgment and Order Directing Submission of Martinez Report [Doc. 31].  In addition, the record indicates that Barboa is still pursuing post-conviction relief, and the ultimate status of his conviction is not yet settled.  The Court does not resolve these issues, as it finds that even if Heck v. Humphrey does not stand as a bar to this lawsuit, Barboa has failed to rebut Defendants' showing in support of summary judgment on the merits.

> D.   There is No Genuine Issue of Material Fact Regarding the Use of Excessive Force, and Defendants are Entitled to Summary Judgment.

As stated above, the test in this case under Tennessee v. Garner is as follows:

> The crux of this case is whether Detective Meyer had probable cause to assume that Ryder had been involved in the commission of a crime involving the infliction or threatened infliction of serious bodily injury, or that she posed a threat of serious physical harm, either to Detective Meyer or others, and that the use of deadly force was necessary to

---

error in the Judgment, as Barboa was charged in count 1 of the indictment with aggravated *battery* upon a peace officer (great bodily harm), in violation of NMSA § 30-22-25(A) & (C);he pled guilty to aggravated battery upon a peace officer; and aggravated battery upon a peace officer is a 3d degree felony, as described in the Judgment and Sentence, whereas aggravated assault on a peace officer is a 4th degree felony.  The Court will presume that the two crimes at issue are aggravated battery upon a peace officer (great bodily harm), under NMSA § 30-22-25, and aggravated assault upon a peace officer (deadly weapon), under NMSA § 30-22-22.

prevent her escape.

Ryder v. City of Topeka, 814 F.2d 1412, 1414 (10th Cir. 1987).

The "seizure" in the present case consisted of Baird's use of deadly force, that is, his shooting at and striking Barboa.  Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir. 1994).  The court in Ryder characterized "the three basic elements of Garner" to be:  (1) whether the defendant police officer had probable cause to believe that the suspect posed a threat of serious physical harm to himself or others; (2) whether the deadly force employed by the officer was necessary to prevent the suspect's escape; and (3) whether the officer gave some warning, if feasible, to the suspect.  Ryder, at 1418.  Although each of these questions could have presented issues of fact to be determined by a jury, the Court finds that defendants have established the absence of a genuine issue of fact as to each of them.

The Court finds there is no question that Barboa's actions, even as he characterizes them, gave Baird probable cause to believe that Barboa posed a threat of serious physical harm to Baird, as well as to the other officers at the scene and to the public at large, and that deadly force was necessary to prevent his escape.

Barboa concedes that he was fleeing from police and trying to evade capture at the time he was shot.  He claims, however, that defendants shot him in the head, in an attempt to kill him, in response to a mere nonviolent property crime.  This does not adequately describe the events of March 17, 1998.

The evidence presented establishes that Barboa was shot only after he was seen driving erratically on a busy street and endangering other drivers; after he failed to stop when being pursued by uniformed police officers in marked cars with full emergency equipment operating; after pulling

into a parking lot and, ignoring an officer's command to stop, fishtailing and spinning about the lot and crashing into a pole; after nevertheless continuing to flee, eventually overturning his truck into a ditch then climbing out and running away in defiance of the officers' clear commands to stop; after leading police on a foot chase into the path of a threatening dog; after jumping into a vehicle being driven by an innocent bystander and demanding that the driver help Barboa escape; after refusing to leave the truck when ordered by police; after driving away at excessive speed although he knew a policeman was attempting to reach him through the window, with the result that the police officer was dragged along with the truck until being thrown off and injured; and after accelerating directly toward another police officer who feared for his own life after seeing his fellow officer thrown from the moving truck and apparently killed by Barboa's reckless conduct. The use of deadly force under these circumstances was justified, and no reasonable jury could find otherwise.

Indeed, the officers could reasonably have concluded that, if they did not employ deadly force as necessitated by the circumstances, and had Barboa left the scene and continued to operate a vehicle in the same desperate manner he had been doing all morning, other persons would surely have been put in danger. As the Tenth Circuit noted in Bella (at 1258 n.9):

> Plaintiff seems to suggest that the officers should have sat idly by until the entire episode came to a close, presumably when the Gazelle ran out of gas. Law enforcement is not so narrowly restricted during such tense ... crisis. Further, plaintiff's argument conveniently overlooks the fact that, had the officers entertained such idle thoughts, the inmate possibly would have escaped, or worse yet, maimed or killed Mr. Bella. In the latter scenario, we might very well be considering here whether the officers violated Mr. Bella's rights by their *failure* to employ more active tactics.

With regard to the dog-shooting incident, although events leading up to an actual seizure are taken into account in determining whether the seizure was reasonable, Bella, at 1256, nevertheless,

the officers' actions during the course of the pursuit, prior to the time that Baird actually fired the shot, are not the crucial factors.  "It must be remembered that '[the Fourth Amendment prohibits unreasonable *seizures*, not unreasonable or ill-advised conduct in general.  Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment.'"  Id. (emphasis in original).

Barboa claims that Eldredge shouted at him to stop, and then shot the dog in a cruel and cavalier manner in order to demonstrate what would happen to Barboa if he continued to run.  Eldredge and Baird dispute this, and both claim that the dog approached them in a threatening manner as they were pursuing Barboa on foot.  Eldredge says that the dog was a definite threat as well as a distraction to him, and he felt it would attack him and perhaps prevent the suspect's capture unless it were taken down.  Barboa, on the other hand, claims that the dog was "harmless" and even slunk off with its tail between its legs when he made a rock-throwing gesture in its direction.  [*See, e.g.*, Doc. 52, at 3-4, ¶¶ 6-7].

The Court need not resolve this dispute.  Under Bella, the issue of reasonableness or unreasonableness of Eldredge's actions in shooting the dog while the officers were pursuing Barboa on foot is not material to the question of whether Baird used excessive force when he later shot Barboa through the windshield of a truck, which Barboa was operating at the time and, indeed, had just used to injure Eldredge.

It is true that the officers' actions, if as callous and irresponsible as Barboa portrays them to be, could be actionable if in so acting the officers recklessly or deliberately created the situation which led to the need for deadly force.  Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995).  However, it was not Eldredge's shooting of the dog that caused the need for deadly force.  Prior to

the time the dog was shot, Barboa had already run a red light, driven into a parking lot where he ignored police orders to stop, whipped his car around and crashed into a utility pole, continued to evade police by turning onto a slick muddy ditch bank where he proceeded to slide into the ditch and overturn his vehicle, then jumped out of the overturned truck, ignored the officers' commands to stop, and proceeded to lead the officers on a foot chase through fields and over fences.

All of this occurred while police officers, in uniform and in marked police cars, were following Barboa and repeatedly ordering him to stop. He had several opportunities to do so before the dog ever appeared on the scene. Under these circumstances, which Barboa does not essentially dispute, no reasonable jury could conclude that anyone other than Barboa created the circumstances that led to the confrontation with Baird, regardless of whether or why Eldredge shot a dog prior to the moment of actual "seizure."

The evidence outlined above establishes that the officers had probable cause to believe that Barboa posed a threat of harm to himself and others and that Baird was justified in using deadly force to prevent him from continuing on his destructive course. Furthermore, defendants have established the third element of the Ryder/Garner test, in that there is no question that they gave Barboa ample warning before finally being forced to fire on him, as the following evidence illustrates:

The officers turned on their emergency lights and sirens during the initial phases of the pursuit. Barboa failed to stop. When Barboa pulled into a parking lot early on in the chase, Eldredge, in a display of official police authority, commanded that Barboa stop and remain in his vehicle. In response, Barboa pulled away at an unsafe speed, crashed into a utility pole, and continued to flee. After Barboa overturned his truck into a ditch and climbed out onto the side of the vehicle, the officers, with guns drawn, ordered him to stop. Instead, he looked at them and ran away on foot.

They followed, shouting at him to stop.  He continued to run.

Barboa then jumped into a pickup truck and demanded that the innocent man behind the wheel drive him away and, when the police commanded that Barboa get out of the vehicle, he refused to do so, driving away in reverse and dragging a police officer with him.  Finally, Baird commanded him yet again to stop, but instead Barboa accelerated toward Baird, who reasonably feared for his life and shot Barboa in an effort to stop this sequence of events.  Defendants have established that they gave ample warning before employing deadly force.

All of the evidence, aside from Barboa's bald assertions, is consistent with defendant's version of the events of March 17, 1998. Barboa's only response to this evidence is that Defendants are lying; however, he also concedes that he really cannot remember anything about what happened that day. This is insufficient to avoid summary judgment, and there is no true dispute for a jury to resolve. Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.  Anderson, 477 U.S. at 248-49; Biester, at 1266.  As noted above, "[the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to create a dispute of fact that is 'genuine.'"  Lancaster, at 1347.       The Court thus finds that defendants have established, as a matter of law, that the defendant officers had probable cause to believe that Barboa posed a threat of serious physical harm to himself, to the police, and to the public at large; that the deadly force employed by Baird was necessary to prevent Barboa from escaping and endangering himself and others; and the officers gave repeated warnings to Barboa to stop and surrender, which he repeatedly ignored.  The Court finds that summary judgment is appropriate on Barboa's claim of excessive force against the individual officers.

Barboa also names the county as a defendant, alleging a custom and policy of encouraging the use of excessive force, and further alleging failure to supervise.  However, the Court need not reach the issue of municipal liability, having found no individual liability against the police officers. Wilson v. Meeks, 98 F. 3d 1247, 1255 (10th Cir. 1996).

E.  Disposition of Pending Motions.

As noted above, Barboa filed a motion to strike portions of the affidavit of James Scott Baird [Doc. 41], and Defendants filed a motion to strike and to preclude further filings [Doc. 53].  The Court finds that the Baird affidavit is competent evidence and therefore denies Barboa's motion, and finds that this recommended disposition renders moot Defendant's motion to strike.

Barboa also filed a late motion for appointment of counsel [Doc. 59], and a petition for writ of habeas corpus ad testificandum [Doc. 58].  No response is necessary to these motions.  Several prior requests for counsel have already been denied in this case, and Barboa has not raised any convincing new arguments for appointment.  He is representing himself vigorously and in an intelligent manner. In addition, the disposition of this case renders moot his request for a writ of habeas corpus ad testificandum [Doc. 58], and the request is denied on that ground.

**Recommended Disposition**

1.  That summary judgment be granted in favor of Defendants and all of Barboa's claims  be dismissed; and

2.  That Plaintiff's motion to strike several portions in James Scott Baird affidavit [Doc. 41] be denied; and

3.  That Defendants' motion to strike and to preclude further filings [Doc. 53] be denied as moot;

24

4.  That Plaintiff's motion for appointment of counsel be denied [Doc. 59]; and

5.  That Plaintiff's motion for a writ of habeas corpus ad testificandum [Doc. 58] be denied

as moot.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge